UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 22-cr-10005-DPW |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DAVID SCHOTTENSTEIN, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Over a period of several years, the defendant, David Schottenstein, engaged in a classic insider trading scheme: he repeatedly obtained highly confidential information about publicly traded companies from members of his own family, he traded on the basis of that information, and he tipped two of his friends (including one in whose hedge fund he had invested) so that they could trade on it. He also obtained inside information from one of those friends and passed it to the other. Driven by avarice and a sense of entitlement, he pursued his crime eagerly, with little regard for its wrongfulness, except insofar as he took steps to protect himself from getting caught. Through this scheme, Schottenstein and his co-conspirators, Kris Bortnovsky and Ryan Shapiro, netted at least $4.5 million—money they did not need, because at least Schottenstein and Shapiro were already millionaires many times over.

And as he engaged in secret criminality, the defendant held himself out publicly as a successful entrepreneur and generous philanthropist,[1] even serving, alongside Shapiro, on the

---

[1] *See, e.g.*, "$10K Winner Announced, Plus New $10K Raffle," COL Live, Nov. 21, 2021 ("please watch this video from philanthropist and CGGD grant-maker David Schottenstein"), *available at* https://collive.com/10k-winner-announced-plus-new-10k-raffle/; "Schottenstein, On How To Leverage Your Charity Dollar"), *available at*

board of trustees of their synagogue and the board of directors of the Aleph Institute, a not-for-profit organization that, among other things, supports incarcerated individuals and advocates for leniency in sentencing.[2]

For his actions, and in light of the considerations set forth below, the government respectfully recommends that the defendant be sentenced to a term of 46 months in prison followed by 24 months of supervised release, and that he be ordered to pay a fine of $1.2 million, and to forfeit $634,893, as set forth in the government's motion for an order of forfeiture, Dkt. 62.

### I. Overview of the Offense Conduct

Over a period of several years, the defendant repeatedly and deliberately sought out material, non-public information ("MNPI") from his cousin, who was an insider at several companies that the Schottenstein family controlled or in which they were major investors. Among them: Albertsons, American Eagle Outfitters ("AEO"), Designer Shoe Warehouse ("DSW"),[3] and Green Growth Brands ("GGB"). The information the defendant obtained was sensitive, detailed, and market moving. It included information about DSW's and AEO's financial performance, the Schottenstein family's plans to take DBI private, Albertsons' plans for the acquisition of Rite Aid Corp., and GGB's plans to launch a hostile bid for Aphria Corp. It also included information about companies with which the Schottenstein family had business relationships, including Liberty Health Sciences, Inc. ("Liberty Health"). Schottenstein used this unfair informational advantage

---

https://www.youtube.com/watch?v=OAT9hZ8t20o ("Renowned philanthropist, David Schottenstein addresses the questions he often receives. Why give to Mayanot rather then a soup kitchen?").

[2] *See* Kenneth P. Vogel, et al., "Behind Trump Clemency, a Case Study in Special Access," *The New York Times*, Dec. 24, 2020, *available at* https://www.nytimes.com/2020/12/24/us/politics/trump-pardon-clemency-access.html; *see also* "Leadership, The Shul," *available at* https://www.theshul.org/aboutus.

[3] In or about March 2019, DSW changed its name to Designer Brands, Inc. ("DBI").

2

to earn hundreds of thousands of dollars buying and selling stocks, and also passed the information to Bortnovsky and Shapiro, so that they could trade on it. Bortnovsky, in turn, provided inside information about other companies, including At Home Group, to Schottenstein, who passed that information to Shapiro. Notably, Bortnovsky's trading on the defendant's tips further benefited Schottenstein, who was an investor in Bortnovsky's hedge fund, Sakal Capital Management. And Schottenstein also had a close personal relationship with Shapiro, a highly successful businessman and fellow leader of the defendant's religious community in Florida.

The details of the defendant's tipping and trading scheme are set forth in the Information to which he pled guilty and in the Pre-Sentence Report ("PSR"). For purposes of sentencing, two features of the scheme bear particular note. <u>First</u>, the inside information Schottenstein obtained, and traded on, and tipped his friends about, did not fall into his lap. To the contrary, Schottenstein went to lengths to seek it out. He called his cousin repeatedly from Italy to learn about DSW's financial performance. He traveled to Las Vegas for the specific purpose of learning from his cousin about GGB's plans to acquire Aphria. He traveled to New York to meet with Bortnovsky, where their brief meeting focused on one topic—the planned acquisition of At Home by a private equity group—before returning to Florida that same day and sharing that information with Shapiro.

<u>Second</u>, Schottenstein was aware that his actions were criminal, and took steps to protect himself and his co-conspirators. He made sure not to communicate inside information over the telephone, but instead passed information to Bortnovsky and Shapiro in person, to avoid detection. When meeting with Bortnovsky in New York, and on a different occasion in Miami, he followed Bortnovsky's instructions to leave his phone in a different room while they discussed the inside information. He even sent cover messages falsely denying that he was passing inside information precisely because he knew he was, to create a defense if he later needed one.

Upon being approached by law enforcement agents in June 2021, Schottenstein initially agreed to cooperate with the government's investigation of his co-conspirators. He met with government prosecutors for proffer interviews on two occasions. During those proffers, Schottenstein acknowledged his role in an insider trading conspiracy with Bortnovsky and Shapiro, though he initially minimized certain details concerning his relatives.[4] Schottenstein later met with federal agents on multiple occasions and provided additional text communications and other information about Bortnovsky and Shapiro, and agreed to covertly record two, in-person conversations with them. On the first occasion, Schottenstein recorded Bortnovsky making self-incriminating statements about their joint illegal activities. On the second, Schottenstein contended that his anxiety prevented him from recording Shapiro, his close friend and fellow congregant.

In at least two instances of which the government is aware, Schottenstein disregarded instructions the government provided him not to discuss this case with others, or read about it. First, in or about February 2022, he reached out to a reporter for Columbus Monthly, a publication that had published an article about his family. The article described a meeting between the defendant and a cousin in which he sought to resolve an inter-family dispute unrelated to this case, and in which he purportedly "present[ed] himself as a paragon of probity who wanted to protect their family name."[5] Schottenstein contacted the reporter by phone and text to protest the

---

[4] Schottenstein's Cooperation Agreement provides that in the event the defendant breaches the agreement, the U.S. Attorney has the right "to use against Defendant any of Defendant's statements, any information or materials he provided to the government (or any information directly or indirectly derived therefrom) during investigation or prosecution of his case." The Cooperation Agreement further provides that "[t]he U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understanding about this issue."

[5] *See* Dave Ghose, "Growing Up Schottenstein: The Blessing and Burden of Belonging to Columbus' Last Dynasty," March 2022, *available at* https://cathyschottenstein.com/growing-up-schottenstein-the-blessing-and-burden-of-belonging-to-columbus-last-

description, and to provide an interview. In those communications, Schottenstein acknowledged his illegal conduct but also contended that "he realized on his own that the trades were improper and [that he] stopped doing them in January 2019," two years before the government approached him.[6] (Schottenstein likewise advised the Probation Office that "he recognized on his own that his conduct was wrong" and "ceased his illegal securities fraud several years before the investigation began." (PSR ¶ 105)).

In fact, Schottenstein's trading based on MNPI continued at least well into 2019. And, of course, Schottenstein knew all along that his trades were improper, which is why he took steps to conceal them. Indeed, as late as June 2019—months after Schottenstein told Columbus Monthly that he "realized on his own" that his trading was improper—Schottenstein was warned by a senior executive of Green Growth Brands not to continue trading that company's shares while in possession of inside information obtained from his family members who controlled the company. During a June 28, 2019 call, which was intercepted pursuant to a Court-authorized wiretap, Schottenstein falsely denied trading while in possession of inside information, as set forth below:[7]

| | |
|---|---|
| GGB Executive: | I heard you've been selling shares against tons of insider information. |
| Schottenstein: | Such a liar. Wow. Where do you make this shit up from? |
| GGB Executive: | I don't know. |
| Schottenstein: | It's not true. Whoever is telling you, whoever, whoever is telling you that is [UI]. |
| GGB Executive: | Nobody is telling me that. I have, I have the, the . . . as part of our transaction in Florida, we have to get a very detailed cap table from the transfer, from the transfer agency, because it divulged [UI] our cap table in depth. And it looks like our little friend David's been selling. |

---

dynasty/?utm_source=rss&utm_medium=rss&utm_campaign=growing-up-schottenstein-the-blessing-and-burden-of-belonging-to-columbus-last-dynasty.
   [6] *Id.*
   [7] Excerpts from the call cited here are based on draft transcripts.

Schottenstein: I sold some shares just 'cause I needed some cash.

\*\*\*

GGB Executive: David. Tread lightly my friend. I won't tell [your cousin] 'cause it's not necessary to cause a fight, but tread lightly.

Schottenstein: I am treading lightly and again, if you look at what I, I appreciate that because I'm sure it would cause a fight. But I, but I've never in my, I've never one single time sold shares on the basis of anything going on. In fact, I just had to sell shares recently, despite for example knowing that there's probably some big stuff happening and I had no choice.

GGB Executive: It's illegal.

Schottenstein: It's not illegal.

GGB Executive: It doesn't matter that you had no choice. It's illegal. It's illegal to trade shares when you have inside information. In fact, given your relationship, you should be having to probably clear every single trade you want to do with our compliance department.

Schottenstein: So how should, so let me ask you a question. How am I supposed to, if I hear stuff, right? If stuff's going around and I hear stuff. How am I supposed to ever sell any shares?

GGB Executive: You're hearing from a principal and a board member. I mean, listen, don't play coy [talking over each other].

Schottenstein: I'm not playing coy. I'm not playing coy. I'm asking you. How am I supposed to ever sell any shares if I'm in that, if I'm in the sphere, if I'm around people, how am I ever supposed to sell any shares?

GGB Executive: Well, I don't think anybody really thinks you're selling shares, just not after when they tell you stuff.

Schottenstein: Ummmmm.

GGB Executive: I think people will tell you, assume you're long term like us, not part of [UI] . . . [talking over each other]

Schottenstein: I am long, I am long term. I still have a massive position. I think, I think as of right now between all my accounts, I probably own 275,000 shares of GGB, plus my warrants.

| | |
|---|---|
| GGB Executive: | You sold about half of it. |
| Schottenstein: | Plus my warrants. |
| GGB Executive: | You sold, you sold about half [UI]. |
| Schottenstein: | No I didn't.  I never had that many.  What are you talking about? |
| GGB Executive: | Be careful David.  This is your warning.  I don't want to have this call again. |

<u>Second</u>, in or about October 2022, Schottenstein's attorneys disclosed to the government that he had read a government filing in this case, and that he had discussed it with his rabbi. Although counsel did not provide further details, Schottenstein is, as noted, a member of the board of trustees of his south Florida synagogue along with Shapiro, and also serves with Shapiro on the board of directors of the Aleph Institute, an organization closely associated with the synagogue's head rabbi.  In November 2022, Schottenstein's attorneys notified the government that he would no longer cooperate with its investigation and prosecution of Shapiro because he faced pressure in his community and had suffered mental health issues as a result.  The government thereafter dismissed the case against Shapiro and Bortnovsky.

## II.     The Applicable Sentencing Guidelines

Schottenstein pled guilty to a one-count Information charging him with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 1349. The government agrees with the Probation Office's revised calculation of the Sentencing Guidelines, as set forth in the final PSR, concluding that the defendant's total offense level under the Guidelines is 23.  That calculation reflects a base offense level of 8 in accordance with Sections 2B1.4; an 18-level increase based on the gain from the offense, pursuant to Section 2B1.1(b)(1)(J);

and a 3-level decrease pursuant to Section 3E1.1 for acceptance of responsibility. The resulting Guidelines sentencing range is between 46 and 57 months.[8]

## III. Sentencing Recommendation

The government respectfully submits that the relevant factors under Section 3553(a) support the imposition of a sentence of incarceration of 46 months, at the low end of the applicable Guidelines range, together with two years of supervised release, a fine amounting to approximately twice the amount the defendant personally profited from the offense, and forfeiture.

### A. Section 3553(a) Factors

#### 1. The Nature and Circumstances of the Offense

The nature and circumstances of the offense are serious. The defendant's crime was neither discrete nor aberrational. It was not the product of a single misguided act or a one-time poor decision, but rather a concerted and sustained effort over time to profit from insider trading that he knew was wrong. Using his status as a member of a family with extensive holdings in the American retail industry, Schottenstein repeatedly sought out material non-public information from family members and traded on it. Over the course of years, he personally cheated, and he tipped Bortnovsky and Shapiro so that they, too, could trade on inside information—earning himself still more money in the process, because between at least July 2017 and February 2018, Schottenstein was also an investor in Bortnovsky's hedge fund. Schottenstein also obtained illicit

---

[8] The government's objection to the Probation Office's prior calculation of the Sentencing Guidelines is set forth at pages 32–35 of the PSR.

tips from Bortnovsky. And he did this again and again, as part of a scheme that generated millions of dollars.

The scheme was manifestly criminal. The defendant arranged to meet his co-conspirators in person to discuss their trading, because he was afraid to discuss it on the phone. He shut off his cell phone when he met with Bortnovsky, and left it in another room. He drafted false exculpatory messages designed to provide cover for his illegal actions if he were ever caught.

And his crime caused real harm. In anticipation of sentencing, the defendant's attorneys have requested that the government produce evidence that "any specific individual person sustained any economic loss/harm" as a result of Schottenstein's illegal trading or that the trading affected the price of the relevant stocks. But these questions miss the mark and are merely an effort to distract from the defendant's conduct.[9] Insider trading does not typically affect stock prices in a measurable way, and the defendant is not charged with such manipulation. *See United States v. Martoma*, 48 F. Supp. 3d 555, 569 (S.D.N.Y. 2014) ("In insider trading cases . . . the focus is not on the effect of the defendant's trading on the market, but instead on the fact that the defendant has engaged in unlawful trading and benefited from it."); *United States vs. Rajaratnam*,

---

[9] Counsel likewise requested evidence that Schottenstein was specifically aware of the number of securities Bortnovsky purchased based on his tips. This question is equally misplaced, as foreseeability is irrelevant under Section 2B1.4. *See United States v. Kluger*, 722 F.3d 549, 559 (3d Cir. 2013) ("the Sentencing Commission could have inserted an explicit foreseeability requirement in § 2B1.4 if it had wanted to do so"); *id*. at 561 ("the plain language of the background commentary to § 2B1.4 clearly indicates that [defendant] can be held responsible for the full extent of [co-conspirator's] gains. [Co-conspirator] is explicitly an individual 'to whom the defendant provided inside information.' . . . Therefore, [co-conspirator's] gains should be attributed to [defendant] in their entirety."). And even if it were relevant, Schottenstein—as a friend of Bortnovsky who invested in his hedge fund, received investor updates from the fund, and communicated regularly with Bortnovsky about their investments—plainly foresaw that Bortnovsky was making substantial, six and seven-figure investments based on his tips, just as Schottenstein himself did, and as he counseled Shapiro to do. *See* Dkt. 1, ¶ 25 (Schottenstein instructing Shapiro: "Tomorrow, I want you to buy $500k-$1m of HOME, with a limit of $24.65.").

No. 09 CR. 1184 RJH, 2012 WL 362031, at *6 (S.D.N.Y. Jan. 31, 2012) ("When an insider trades on the basis of material, non-public information, the insider usually does not cause any price inflation or deflation."). And the victims of insider trading schemes are difficult, if not impossible, to identify. *See Mooney,* 425 F.3d at 1105 ("in insider trading cases 'gain' is the relevant concept, because it would be unworkable to try to identify specific victims and their losses"). That is because the very nature of insider trading is that it is a crime of opportunity, perpetrated by those—like the defendant—in privileged positions of access to inside information, at the expense of ordinary investors who lack such access. This does not make the crime any less serious, or its victims any less real. They are very real: sophisticated institutional investors among them, but also amateur investors and retirees on fixed incomes—indeed, anyone who invests in the market and plays by the rules. The defendant's gains were their loss—even if they never suspected as much. In this regard, while the charged crime is not the same as an investment fraud in which an investment adviser plunders the last dollar of an elderly retiree, neither is it victimless. The crime in which Schottenstein and his co-conspirators engaged is little different from any other fraud scheme: they cheated other investors believing that they could get away with it, and that doing so would benefit them over time.

Further, insider trading harms the larger market as well, undermining faith in its fundamental fairness. Events of recent days make clear what a lack of faith in financial institutions can precipitate: a run on the bank, and massive losses that may follow. And the same is true of the stock market. Markets depend on investor confidence. If investors lose that confidence, they will pull their money out, or not invest to begin with—and the entire system is jeopardized. *See* Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv. L. Rev. 322, 356 (1979) ("If the market is thought to be systematically populated

with . . . transactors [trading on the basis of misappropriated information] some investors will refrain from dealing altogether, and others will incur costs to avoid dealing with such transactors or corruptly to overcome their unerodable informational advantages"). A meaningful sentence in insider trading cases thus serves to protect the trading public and promote respect for the securities laws.

    2.   <u>The Defendant's History and Characteristics</u>

  Born into extreme wealth, Schottenstein has led a life of rare privilege. Not yet 40 years old, he is worth tens of millions of dollars and resides in a luxury beachfront condominium. Though his formal education is limited, he is both intelligent and industrious, and was able to capitalize on the resources and networks available to him by starting and selling multiple businesses.

  Notwithstanding his good fortune, Schottenstein embarked on a years-long scheme to take advantage of his position to earn still more money by illegal means. His conduct underscores the dangers that cases like this lay bare: the defendant's extraordinary privilege is, in fact, what placed him in the position to engage in insider trading. Through his close connections to those at the highest levels of multiple companies, he gained access to the financial secrets they kept. And it was that access that allowed the scheme to occur.

  Schottenstein had no reason to commit a crime—and certainly not a financially motivated one. He engaged in insider trading not because he was struggling financially, not because he suffered under the enduring legacy of a challenging upbringing, not because he lacked the ability to appreciate the wrongfulness of his actions, but rather because of greed, and because he thought he could get away with it. His crime was the product of a rare blend of entitlement and opportunity. The fact that someone blessed with every advantage in life would engage in such brazen

criminality to line his own pockets, and those of his wealthy friends, counsels in favor of a meaningful sentence of incarceration.

> 3. The Need for Just Punishment, Adequate Deterrence,
> and the Avoidance of Unwarranted Sentencing Disparities

Insider trading is not a unique crime, and the defendant is not alone in having access to inside information.  Each day, in corporate boardrooms and accountant's cubicles, in pharmaceutical labs and doctor's offices, at country clubs and over drinks in a bar, countless individuals gain access to secret, market-moving information and face the opportunity to cheat.  Some do.  Those that resist the temptation do so for two reasons:  first, because it is a basic tenet of society that cheating is wrong; and second, because they know that if they are caught, the consequences will be severe.  They will lose their jobs, their good name, and very likely, their liberty.

And yet, even having been caught, the defendant faces few of these consequences.  As an entrepreneur, he has no job to lose.  Indeed, since pleading guilty, he has helped to launch two new companies:  Thomas Ashbourne Craft Spirits, a company that produces ready-to-sip cocktails, and 7th Heaven, a chocolate company.  PSR ¶¶ 124–25.  Though he complains that his *cooperation* with the government caused him to be ostracized and subject to ridicule in his religious community, *id*. ¶¶ 105, 113, his *conviction* and pending sentence have clearly not had that effect.  As the defendant himself points out, he was recently invited to deliver the keynote address at a national

business conference.[10]  He apparently continues to serve (with Shapiro) on the board of his synagogue and of the Aleph Institute.  And his wealth is undiminished.

The sentence the government seeks takes all this into account.  Just punishment requires that someone who generated millions of dollars through an extensive insider trading scheme, trading in multiple companies, on repeated occasions, over years, serve a meaningful term of incarceration.  Prison is also necessary here for its deterrent effect—both specific and general.  As a young entrepreneur, Schottenstein will undoubtedly face other opportunities to commit financial crimes when he thinks no one is looking, and other circumstances that require him to choose between right and wrong.  A substantial term of incarceration is critical to remind him of the consequences of crossing that line, and necessary to protect society from his wrongdoing.  *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (recognizing "the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense.").

Likewise, general deterrence is particularly important for crimes such as this one, that occur quietly, over the computer or telephone, or, as here, in backyards and private apartments.  *See id*. ("Because economic and fraud-based crimes are more rationale, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal citation and quotation omitted).  Insider trading in private venues is extremely difficult to detect, and even more difficult to prosecute—as the dismissal of charges against the defendant's

---

[10] *See* "David Schottenstein to Deliver Keynote Speech at Business Conference," COL Live, Jan. 11, 2023, ("In his upcoming talk entitled, 'There is Only One CEO…Important Lessons I Learned the Hard Way,' David will go into detail about some of the challenges he has faced and how he has emerged from them stronger than ever before."), *available at* https://collive.com/david-schottenstein-to-deliver-keynote-speech-at-business-conference/.

co-conspirators makes clear. There is no way to police these one-to-one interactions, especially where the participants can now trade easily over the Internet, without even speaking to a broker. While securities professionals are regulated by the SEC and self-regulating organizations like the Financial Industry Regulatory Authority, nonprofessionals like Schottenstein are under no such supervision. For that reason, where the government does successfully prosecute a case of this kind, sentencing should reflect the need to deter the many others who might otherwise engage in this same kind of misconduct, because the likely alternative is that they simply do not get caught. The Guidelines sentencing range takes such deterrence into account. Increased, publicized prosecution of insider trading *does* result in less insider trading. General deterrence works.[11]

A meaningful sentence of incarceration in this case will help make unambiguously clear that everyone is accountable to the law regardless of status, and will help deter others from engaging in similar crimes of opportunity. Absent meaningful consequences, there is little save good intentions that will deter criminal conduct like that committed by this defendant and his co-conspirators.

The sentence the government seeks also avoids disparities with other defendants who have committed similar crimes. In recent insider trading cases in this district, defendants have received

---

[11] *Cf., e.g.*, Del Guercio, D., et al., *The Deterrence Effect of SEC Enforcement Intensity on Illegal Insider Trading* (Sept. 2013), *available at* http://corpgov.law.harvard.edu/2013/07/19/the-deterrence-effect-of-sec-enforcement-intensity-on-illegal-insider-trading/ (abstract and link to full article; statistical analysis finding correlation between deterrence and intensity of SEC enforcement); Gider, J., *Do SEC Detections Deter Insider Trading? Evidence from Earnings Announcements* (Dec. 2013), *available at* http://econstor.eu/bitstream/10419/100343/1/VfS_2014_pid_430.pdf (analyzing sample of 398 earnings announcements in which SEC detected insider trading activity; finding deterrent effect on future trading).

sentences ranging from six months to three years for crimes significantly less prolonged, less remunerative, and less brazen than this one:

- In *United States v. Chan*, 16-cr-10268, Judge Talwani sentenced defendant Schultz Chan, a pharmaceutical biostatistician, to three years in prison for engaging in a scheme to exchange inside information with a friend at another pharmaceutical company so they could both trade on it. The scheme netted the two defendants approximately $1.7 million over less than two years—less than half the $4.5 million the defendant and his co-conspirators made in this case. *See United States v. Chan*, 16-cr-10268, Dkt. 345. Judge Talwani sentenced Chan's codefendant, Sonjiang Wang, to six months in prison based on her conclusion that he was a lesser participant in the scheme and made only approximately $200,000 of the total $1.7 million in illicit proceeds. *See United States v. Wang*, 16-cr-10268, Dkt. 360 at 52–53.

- In *United States v. Bray*, Judge Young sentenced a 78-year-old contractor to two years in prison, three years of supervised release, and a $1 million fine for a single episode of trading on the shares of a local bank. In contrast to this case, the crime involved a single tip passed on a single occasion over drinks at a local country club that generated $300,000—less than 10 percent of what the defendant and his co-conspirators made here. *See United States v. Bray,* 14-cr-10356, Dkt. 88.

- In *United States v. Gadimian*, Judge Young sentenced a corporate insider to 27 months in prison and two years of supervised release for trading on the basis of MNPI about his own company's stock several times over a period of three years, earning approximately $1.1 million in the process. *See United States v. Gadimian*, 16-cr-10285, Dkt. 92.

- In *United States v. Kanodia*, Judge Gorton sentenced a defendant to 20 months in prison for tipping two friends based on information obtained from his wife, netting $1.3 million in profits, approximately $240,000 of which were paid to the defendant as a kickback. As in *Bray*, the crime involved a tip about a single stock on a single occasion, and the profits were little more than a quarter of those the defendant and his co-conspirators earned. Notably, Kanodia had led an otherwise exemplary life, had a significant history of charitable works, and was primarily responsible for the care of his elderly parents, who were in ill health. *See United States v. Kanodia*, 15-cr-10131, Dkt. 245.

- In *United States v. McPhail*, Judge Casper sentenced a defendant to 18 months in prison for his role in an insider trading scheme in which he did not himself trade on inside information, but misappropriated information about a single stock from a friend and tipped others who traded, netting the seven participants a combined $750,000 in profits and avoided losses. The combined gain of all seven defendants barely matches the gain of the defendant alone in this case, and is a fraction of the

15

gain his co-conspirators earned based on his tips. *See United States v. McPhail*, 14-cr-10201, Dkt. 179.

Moreover, this Court has sentenced significantly less culpable insider trading defendants to meaningful terms of incarceration. In *United States v. Larrabee*, the defendants—an insider at a law firm acting as the tipper and a stockbroker acting as the tippee—committed insider trading by buying shares of BayBanks while in possession of MNPI about its merger with Bank of Boston. *See United States v. Larrabee*, 240 F.3d 18, 20 (1st Cir. 2001); *United States v. D'Angelo*, 98-cr-10208-DPW. This Court sentenced both defendants—who traded on MNPI on only one occasion and profited less than $90,000—to 21 months in prison. *See id.* at Dkts. 128, 129. In sum, the 46-month sentence the government requests compares favorably with these prior sentences, all of which involved meaningfully less money, less protracted conduct, and fewer instances of insider trading in fewer stocks.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 46 months, followed by 24 months of supervised release, a fine of $1.2 million, and order forfeiture in the amount of $634,893.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  /s/ Stephen E. Frank
STEPHEN E. FRANK
SETH B. KOSTO
Assistant United States Attorneys

**Certificate of Service**

      I hereby certify that this document was filed through the ECF system on March 14, 2023 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

      By:    */s/ Stephen E. Frank*
                   STEPHEN E. FRANK
                   Assistant United States Attorney