UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>v.<br><br>DAVID SCHOTTENSTEIN,<br><br>                          Defendant. | Case. No.: 1:22-CR-10005-DPW |

## REPLY BRIEF IN SUPPORT OF TIME-SENSITIVE MOTION TO STRIKE GOVERNMENT SENTENCING MEMORANDUM

Defendant David Schottenstein respectfully submits this reply-brief in support of his motion to strike the government's sentencing memorandum.

### A. The Government's Wiretap

As set forth in David's opening brief (Dkt. 73), on March 14, 2023 the government, in violation of Title 18, United States Code, Section 2518(9), sandbagged the defense with a single wiretap call, taken out of context, which purported to show that David was engaged in insider trading in June 2019. The government concedes that they failed to comply with the clear verbiage of the wiretap statute—mandating disclosure 10-days before a hearing—but then offers a potpourri of excuses as to why they did not have to. None are persuasive.

*First*, the government contends David's requested remedy of striking the government's memorandum isn't available, because the only remedy for violation of § 2518(9) is to suppress the wiretap. Dkt. 77 at 7. This argument runs contrary to the plain language of the statute, which specifically states that if the application is not provided more than 10-days in advance, the wiretap "*shall not be received in evidence or otherwise disclosed* in any trial, hearing, or other

proceeding." If suppression (and not exclusion) was the only remedy, Section 2518(9) would be meaningless.[1]

*Second*, the government asserts that "it is not clear that section 2518(9) even applies" because the wiretap call is being used for impeachment purposes. As explained below, it is not. But even if we assume the government is only using the wiretap to "impeach" David, § 2518(9) has no "impeachment" exception. That's especially true, as here, where the government has known about the statements it wants to impeach for a year. In fact, the sole forty-year-old case cited by the government, *United States v. Winter*, 663 F.2d 1153-54 (1st Cir. 1981), cuts against its own argument. In *Winter*, the defendant testified at trial and so of course it was only fair that government prosecutors could use a wiretap to impeach him given that they did not know in advance what he was going to say. Here, however, prosecutors knew *a year ago* what David *actually* said; nonetheless, the government waited until filing their sentencing memorandum to "impeach" David with a mischaracterized telephone call. That is *unfair*.

Regardless, the June 28, 2019 call is not "impeachment" material. The government concedes that for a period of nearly two-years, they: failed to question David about insider trading in GGB despite two full-day proffer sessions and over a 100 calls with agents; did not include the alleged GGB "insider trading" in an Information or plea colloquy with *this* Court (nor did the SEC include it in its Complaint); ended the conspiracy charge (as set forth in the

---

[1] The defense has now learned that the government obtained just one order from a judge in the Eastern District of Virginia on *July 18, 2019*, which permitted the government to postpone inventory "as to all parties … until further order of this Court." But then, for nearly four years, the government made no further motions to show "good cause" to delay the inventory. *See* Sealing Order at 3; *United States v. Harrington*, 557 F.2d 879 (1st Cir. 1977) (suppression is appropriate when the defendant can show prejudice due to failure to provide inventory notice). Nor could the government show good cause to delay notice to David given that by January 2022, David had pled guilty to insider trading. For the arguments on prejudice, the defense relies on the arguments set forth in its opening brief. *See* Dkt. 73 at 6-7.

Information) before the wiretap referenced in the sentencing memorandum even took place; did not dispute David's account in February 2022 (as told to Columbus Monthly) that he had ceased insider trading on his own; *and*, did not provide GGB insider trading information to pre-trial in the draft PSR (or object to its omission in the final PSR), even after David ceased to become a cooperator. The truth is, as demonstrated from the above, that the government did not include it in anything (or even query David about it) because the government did not view it as unlawful activity. The only thing that has changed is that David's mental health prevented him from continuing his cooperation.

Despite this, the government now takes the position that the reason why it never contended that David had engaged in insider trading with GGB before is because the government "wanted Schottenstein to proffer, and testify, from his memory, and not to regurgitate (or limit his testimony to) what he heard on tape." Dkt. 77 at 6. But the government misses the point. The issue is not whether David was confronted with his calls, it is whether the government pressed him, *without using the calls*, as to whether he engaged in insider trading with GGB so that David could give an honest, unrefreshed answer. Indeed, over two full days of proffer, the government pressed him (without showing him materials) on many different issues, including numerous different stocks that David did not illegally trade in, as well as on multiple people that had nothing to do with the scheme. If investigators believed he had engaged in insider trading in GGB stock, they would have at least asked him (with or without the calls). They did not.

Amazingly, the government also asserts that it did "not cite the wiretap call for the purpose of suggesting that the defendant violated the law by trading in GGB in 2019." Dkt. 77 at 10. But that is exactly what the government said. *See* Dkt. 71 at 5 ("In fact, Schottenstein's trading based on MNPI continued at least well into 2019"). Put simply, the government has

utilized an undisclosed wiretap, to assert, for the first time a week before sentencing, that David had not stopped insider trading on his own, but instead continued with criminal activity, and that it was not until June 2019, when he was confronted by a GGB executive, that he stopped. The government used the call to paint David as untruthful. But that is not accurate.[2]

The single wiretap affidavit turned over by the government on March 17, 2023, and which is dated June 18, 2019, further confirms that David was not illegally trading GGB. The affidavit was sworn out just days before the June 28, 2019 call set forth in the government's sentencing memorandum. *See* Dkt. 71 at 5-6. Put bluntly, even though the government had already been tapping David's phone for a month by then, there are *no* allegations of insider trading in GGB stock in the affidavit, despite the fact that David had been sporadically selling GGB shares that spring.

To that point, there *is* an allegation in the wiretap affidavit that on May 19, 2019 at 9:35 a.m., David's relative told him that GGB would "hopefully this week" announce their acquisition of a California-based *private company*. June 19, 2019 Affidavit of BJ Kang ("Aff.") ¶ 81. But there are no allegations that David traded on this information (either by buying or selling GGB). Indeed, it is unclear what effect an acquisition of a private company by GGB would even have on GGB's stock price. Although GGB certainly expected it to be positive—no public company would purchase another company if they expected the stock price to go down— the deal had

---

[2] The government attempts to save face by claiming that *any* trading while in possession of MNPI is a crime. *See* Dkt. 77 at 11. Putting aside the accuracy of whether that applies to David, trading is not the only element of securities fraud. Rather, as this Court correctly stated at David's Rule 11 hearing, to commit securities fraud one needs to have "willfully used a device or a scheme to *defraud someone*," meaning that someone made an "effort to use *fraud* to obtain money from another." *See* Dkt. 18 Plea Tr. at 21-22 (emphasis added). Here, no one can say that *selling* shares while possessing positive information (material or not) about a company is a scheme to defraud anyone. It makes no sense.

almost no impact on the stock price when it was actually announced in July. Moreover, while the affidavit avers that David's relative "may have breached his fiduciary duty to GGB by disclosing MNPI," in fact, David was a major shareholder of GGB, so it was not.

There are also allegations in the affidavit that David, on June 13, 2019, received a call from a third-party who told David that the private company had been purchased by GGB and then later that same day, David had a call with the GGB executive where they discussed the prospective purchase. Aff. ¶ 81 n. 31. This June 13 call is important. There are no hints in the call that the GGB executive thought the stock price would decline; to the contrary, the executive implied that it would be a good for GGB. But again, David did *not* buy stock in reaction to this information, to the extent that he had even formulated any opinion as to how the GGB stock would perform after the news became public (if it wasn't already public, which is an open question given that a third-party had called David with the news). Instead, five to seven days later, David, having learned that he had a capital call in a Las Vegas real estate deal, *sold* GGB stock to cover that capital call. *See* Dkt. 73 at Exs. A and B.

In fact, the wiretap affidavit provides an example showing definitively that David was *not* trading GGB based on MNPI. Aff. ¶ 88. On May 29, 2019, GGB reported terrific financial results, with revenue increasing 77 percent from the prior quarter. There was no trading by David prior to the earnings announcement. Instead, *after* the earnings announcement, David called his relative to celebrate, stating "the only thing up in my portfolio is GGB." Aff. ¶ 88. Obviously, if David was trading GGB stock on the basis of MNPI, he would have loaded up on GGB before the announcement. But David, who had already voluntarily stopped his insider trading activities on the advice of his wife, was only selling shares.

5

Notwithstanding the government's belated arguments, it is evident that the GGB executive's call to David was not because the executive thought David actually was engaged in insider trading, but because the executive had learned that David was selling GGB shares. *See* Ex. A, Tr. at 2:3-12. Specifically, David had learned that the executive was being compensated primarily in GGB stock, and during that time-period, GGB stock was on a downward slide, thereby significantly impacting the executive's net worth. The executive believed that sellers like David were driving the price down, and he wanted David to stop. This is confirmed when the executive told David toward the end of the call: "I don't think anybody really thinks you're selling shares. That's why they tell you stuff … I think people that tell you assume you're long-term like us, *not part of the problem*," *id.* at 6:11-13 (emphasis added), referring to those driving down the price by selling. The call was the executive's attempt to bully David into holding his shares to prop up the price, not a bona fide warning to stop engaging in insider trading.

In addition, although the FBI agent averred that he had probable cause to tap David's telephone in June 2019, the calls from the prior 30-days (which were relied upon to continue the tap in June) do *not* show insider trading, further confirming that David's account of events is accurate. As examples of two averments in the affidavit:

- On May 6, 2019, there was a call between Bortnovsky and David where they discussed the impact of the Trump tariffs (announced the day prior) on stock prices of various American companies that relied on Chinese goods. No insider information is exchange in the call. However, based on David's statement that he "took a nice position in American Eagle, DSW, in, in Designer Brands," the agent concluded, based on his "training and experience" that that statement was a "coded instruction" to acquire shares in those companies. That conclusion is unreasonable. The two men had *just* discussed the impact of tariffs on stock prices on companies that import goods from China, which would undoubtedly include major clothing brands such as DSW and American Eagle. Indeed, while Bortnovsky passed this information on, purporting to make it appear that he had some type of inside tip, he did not receive insider information from David, nor was it a code. Aff. ¶ 74.

- The affidavit also references a May 24, 2019 purchase of options by David in the stock DBI (formerly DSW). Aff. ¶¶ 83-84. David made this purchase shortly after meeting with his cousin Joey at his home (which, until this case erupted, David did most days). The affidavit concludes that he left Joey's home, purchased $50,000 worth of options, and then, six days later DBI reported "better-than-expected quarterly revenues," making it appear that David had acquired some type of MNPI from Joey on the quarterly earnings. But that too is untrue. First, and most importantly, David purchased call options with a strike date in October 2019, *which was five months later*. It would have made no sense for David, if he knew DBI stock would increase just six days later in June 2019, to purchase *October* options, which are far more expensive and used for long-term bets (such as on the effect of tariffs on a stock price) rather than short-term plays. *Second*, after purchasing his options, David called Bortnovsky. But instead of tipping Bortnovsky with the information, Bortnovsky *had already purchased* the same October call options for himself. This confirms, again, that there was no MNPI exchanged; rather, this was a long-term tariffs bet which ultimately resulted in large losses for David.

While the government's (mis-)representations regarding David's GGB trading activity are perhaps the most important mischaracterizations in its brief, it is far from the only ones.

As an example, in arguing that David went to great lengths to seek out inside information, the government wrote that David "traveled to New York [on September 6, 2017] to meet with Bortnovsky, where their brief meeting focused on one topic-the planned acquisition of At Home by a private equity group-before returning to Florida that same day and sharing that information with Shapiro." *See* Dkt. 71 at 3-4; Dkt. 1 ¶ 29 ("On or about that same day, September 6, 2017, during an in-person meeting at Bortnovsky's apartment . . . "). This is not accurate; David traveled to New York for two days for business together with his son, and while there paid a brief visit to Bortnovsky's apartment.

In that regard, David made plans to visit New York in early September *before* he even purchased At Home stock. *Compare* Ex. B at 1 (showing David requesting roundtrip tickets for September 5 flight on August 27) *with* PSR ¶ 28 (David purchased At Home stock on August 28). On September 5, 2019, David flew to New York at 6:00 a.m., returning to Florida at 2:54 p.m. that same day. Ex. C at 1-2. The trip was a quick business trip; he did not meet with Kris

7

Bortnovsky. David returned to Florida to pick up his 13-year-old son so that they could both fly back to New York the very next day (Sept. 6), which they did. Ex. B at 18-19. There, David had multiple business meetings, including a photo shoot for his sunglasses company. Ex. B at 7-8, 16-17. That day, Bortnovsky asked David to come to his apartment, and David did, together with his son. *See* Ex. E. David obviously did not expect any illicit information to be passed. But Bortnovsky asked David to step into a backroom with him, which David did, and at that point Bortnovsky told David about the insider he knew at At Home. David and his son stayed at Bortnovsky's apartment for less than 38 minutes, *see* Ex. E, and then they went to dinner, spent the night in Montclair, New Jersey, saw the sights in New York the next day, and flew back to Florida that night. Ex. B at 18-19; Ex. D; Ex. E. It is unclear why the government made this mistake in their memorandum given that David, in his proffer sessions, *twice* told the government that he flew to New York for business (and not to see Bortnovsky).[3]

      The government's mistakes even involved facts readily disproven from its own Information. As an example, the government begins their sentencing brief that the crime occurred "[o]ver a period of several years," (Dkt. 71 at 1) but the government's own Information pegs the conspiracy as being less than two years (21 months), with actual trading occurring in

---

[3] Likewise, the government contends that David traveled to Las Vegas for the "specific purpose" of gleaning inside information about GGB's plans to acquire Aphria, but as David told the government in the proffer, he had previously done trips to Las Vegas with Joey, and so while acquiring inside information from his cousin was certainly one of the reasons for his travel, as he told the government, he went to spend time with his cousin and friends as well. And, while the government makes much of the fact that David repeatedly called his cousin from Italy, David has obsessive-compulsive disorder where he constantly texts and calls everyone (including his attorneys). *See, e.g.*, Dkt. 72-5, Report of L. Brooks Ph.D at 2-3.  He spoke to Joey many times each day and always continued to call/text until he reaches him (or whomever else he's trying to reach).

just six months (with the scheme remaining dormant for many months in between). *See, e.g.*, Dkt. 1 ¶ 57.

The government's mistakes are never in David's favor, of course. For example, the government contends (with no citation) that David was born into "extreme wealth," as if David is some sort of trust-fund baby, and that he started his business with family capital. Dkt. 71 at 11. That is also not true. *See, e.g.,* Dkt. 75. David received none of his extended family's wealth growing up, and even now, he has no trust fund and has received nothing. As David's father writes in his letter, David was raised with a middle-class perspective. *See* Dkt. 72-1 at 224. With respect to Astor & Black, David's first company, he funded the company with money he received from jobs he had growing up and gifts he received at his own wedding; not from the Schottenstein fortune.[4] Once again, David told the government this during his proffer.

As a final example, the government contends that he has faced "few" business consequences, and that as an entrepreneur he had no job to lose. *See* Dkt 71 at 12. This, once again, is false. At the time of his conviction, David was the CEO of Prive Goods LLC (his sunglasses company). As has been publicly reported, David was promptly fired, lost his salary and bonus, was forced to give up millions of dollars' worth of stock, and he had to pay the company $250,000.[5] A simple Google search would have revealed this information. David also had to resign from his drinks company, Thomas Ashbourne, and a key endorser left the

---

[4] A.J. Lawrence*, $50M Exit – David Schottenstein, Astor & Black*, Beyond 8 Figures (Aug. 14, 2019 available at https://beyond8figures.com/podcast_episode/50m-exit-david-schottenstein-astor-black/ at 16:00 to 21:00.

[5] Sandra Halliday, *Safilo boosts controlling stake in Privé Revaux as Schottenstein quits*, Fashion Network (Jan. 17, 2022) https://us.fashionnetwork.com/news/Safilo-boosts-controlling-stake-in-prive-revaux-as-schottenstein-quits,1368937.html

9

company, which is now run by Cara Kamenev.[6] David's departure from Thomas Ashbourne is also public and reflected on the Florida Department of State website regarding business entities.[7] David has also lost various board positions and investment opportunities. David is not complaining about his business troubles, but it is completely inaccurate to say he has faced few consequences for his actions.[8]

These inaccuracies, of which there are more, further merit striking the government's brief.

Dated: March 20, 2023

Respectfully submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Eric S. Rosen*
Eric S. Rosen (Bar No. 568931)
Richard Cipolla (Bar No. 697153)
Devin Freedman (*admitted pro hac vice*)
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel.: (617) 977-4163
Email: erosen@fnf.law

*Counsel for Defendant David Schottenstein*

---

[6] *See* Ashley Bray, *Q&A with Thomas Ashbourne Craft Spirits CEO, Cara Kamenev* (Jul. 12, 2022) https://tinyurl.com/2vak3y74.

[7] Thomas Ashbourne Craft Sprits LLC https://tinyurl.com/4xpz6765

[8] Moreover, David was not invited to deliver the keynote address at a national business conference because of his business acumen. He asked to speak as a convicted felon, imploring people not to make some mistakes that he did. He was using his platform to prevent additional crimes, not to brag about his business credentials. Dkt. 75 at 2.

**CERTIFICATE OF SERVICE**

I, Eric S. Rosen, hereby certify that on March 20, 2023, a true and correct copy of the foregoing was filed publicly on ECF and sent via email to all registered participants.

*/s/ Eric S. Rosen*
Eric S. Rosen
